In the Matter of NIAGARA FALLS POWER COMPANY, Petitioner, against MILO R. MALTBIE et al., Constituting the Public Service Commission of the State of New York, et al., Respondents.

Supreme Court, Special Term, Albany County, April 27, 1943.

*Randall J. LeBoeuf, Jr., Warren Tubbs* and *Lauman Martin* for petitioner.

*Gay H. Brown, Counsel to Public Service Commission* (*George H. Kenny* and *Sherman C. Ward* of counsel), for respondents.

BERGAN, J. By treaty between the United States and Canada, proclaimed May 13, 1910 (36 U. S. Stat. 2448), the diversion of water in the Niagara River was limited, to effectuate the purpose of both governments to maintain the level of Lake Erie and maintain the flow of the river. The United States undertook to limit the diversion of water for power purposes

above the falls within the State of New York to a daily diversion at the rate of 20,000 cubic feet per second. The Niagara River is navigable water, as well as an international boundary stream; it is within the jurisdiction of the United States, and Congress may control and regulate the use of the water. (See *Niagara Falls Power Company* v. *Water Power & Control Comm.*, 267 N. Y. 265.) Since the enactment of the Federal Water Power Act of June 10, 1920 (U. S. Code, tit. 16, § 791 *et seq.*, as amd.), power was delegated by Congress to the Federal Power Commission to grant licenses for hydroelectric purposes along navigable waters of the United States.

On March 2, 1921, the Federal Power Commission issued to the Niagara Falls Power Company, the petitioner here, its original license to divert a daily average of 19,500 cubic feet per second for power purposes at Niagara Falls, which was subsequently increased to 20,000 cubic feet per second, the maximum permissible on the American side under the treaty of 1910. Since 1928 the petitioner has been diverting an average of this amount.

The power company has had in existence, however, facilities for the utilization of water for generating power considerably (over 60%) in excess of the maximum permissible under the treaty limiting diversion. The maximum use of such facilities would employ 32,500 cubic feet per second, or 12,500 more than the treaty maximum.

Early in 1941 the necessity for additional electric power in very substantial amounts for industries engaged in national defense became apparent to the government and an agreement was reached between the United States and Canada on May 20, 1941, approved by the Senate June 12, 1941, authorizing an additional diversion in the amount of 5,000 cubic feet per second on the United States side of the river. (55 U. S. Stat. 1276.) This was implemented by a further agreement on October 27, 1941, authorizing the additional diversion of 7,500 cubic feet per second and approved by the Senate November 27, 1941. (55 U. S. Stat. 1380.) The utilization of these two additional amounts of water, totalling 12,500 cubic feet per second, would occupy the entire generating capacity of the existing facilities of the power company. Immediately after the two governments had agreed on the increased diversions, the Federal Power Commission issued temporary authorizations to the power company to use the additional water, and since November 27, 1941, it has been using a total of 32,500 cubic feet per second. Allotments of power generated have

been made to enumerated industries by the War Production Board.

The temporary authorizations of the Federal Power Commission to the power company to use the additional water were formalized by two amendments to the company's original license of March 2, 1921. One was dated December 23, 1941, relating to the first additional diversion of 5,000 cubic feet per second and the second was dated March 10, 1942, relating to the additional diversion of 7,500 cubic feet per second.

The conditions imposed by the Federal Power Commission and accepted by the power company by the amendments to the license are the focus of the controversy between the petitioner and the Public Service Commission. In that controversy which arises from an order of the Public Service Commission fixing a rate to be charged for the electric energy arising from the additional diversions, and from some other sources not material here, the facts are conceded. The petitioner seeks to review the rate order of the Public Service Commission in pursuance of article 78 of the Civil Practice Act, and to annul it.

The petitioner maintains the only hydroelectric development on the Niagara River and presently it is the only licensee in New York of the Federal Power Commission. It has a relatively small number of consumers of electricity, but they are heavy industries using very substantial quantities of power. The generation and sale of this power being entirely within the State of New York, the rate to be charged for the power is a subject within the jurisdiction of the Public Service Commission.

The rate fixed by the State Commission for power generated from the basic 20,000 cubic feet per second prior to the additional diversions authorized in 1941 was approximately four mills per kilowatt hour. In accepting the authorization by the Federal Commission to divert the additional water which was to be used in generating power for war industries, the company agreed that it would generate and deliver the power created by the additional water without profit to itself as a contribution to the war effort. At the rate of approximately four mills per kilowatt hour then prevailing, the differential between the cost of the power to the company and the charge to consumers for power generated from the additional water would be about $1,000,000 a year.

In view of the willingness of the company to furnish this additional power at cost and without profit to itself, the Federal Power Commission in its authorization to use the addi-

tional water by the two amendments to the company's original license required that the differential between the rate of four mills per kilowatt hour and the cost of furnishing the power generated by the additional water be kept in an "Emergency Diversion Reserve". This fund was to be treated as a payment to the company upon its net investment in the property in the event of acquisition of the plant by the United States on termination of the license, in this case on March 2, 1971. The emergency diversion reserve, in effect, becomes a credit to the United States in the hands of the company toward the cost of public acquisition when its right to acquire under the Federal Power Act (U. S. Code, tit. 16, § 807) has matured and is exercised. The requirement that the difference between cost of furnishing the additional power and the four-mill rate be deposited in this reserve fund was made, in express terms, a condition of the amendments to the license under which the use of the additional water was authorized, and it was accepted by the company.

Subsequent to the Federal authorizations to use the additional water, the Public Service Commission commenced an investigation of the rate to be charged to the consumers in war industries using the additional power thus generated. They were being charged the rate applicable under the company's previously filed schedules of approximately four mills per kilowatt hour, which, as has been seen, was the rate upon which the Federal Commission predicated its direction as to payments into the emergency diversion reserve. The Public Service Commission, having in mind the willingness of the company to furnish this power at cost, made an order on November 6, 1942, directing the company to sell the additional power thus generated to the industries engaged in war production at approximately 2.78 mills per kilowatt hour. By an order of November 19, 1942, this rate became effective January 1, 1943, but its operation has been stayed during the pendency of this proceeding.

The rate fixed by the Public Service Commission approximates the cost to the company of the production of the power from the additional diversions. It contemplated no provision for payments into the emergency diversion fund required by the amendments to the Federal license. It reduces the gross annual revenues of the company by about $1,000,000 for this service. This is approximately the amount that the company would be required to deposit in the "emergency diversion reserve" under the terms of the Federal license amendments.

If the company is required to deposit $1,000,000 annually in the diversion reserve as a credit to the United States in the event of subsequent acquisition of its property based upon a four-mill rate on one hand, and is permitted to charge only 2.78 mills under the order of the Public Service Commission on the other, it will be confronted with a loss of $1,000,000 annually upon an operation it undertook to perform without profit. Thus if the requirements of the two public authorities stand, the property of the company will be confiscated at a very rapid rate.

It is the contention of the company that the requirement in its license for payment into the emergency diversion fund is an absolute condition of the permission of the United States to use the additional water; that the requirement, including the calculation of the amount to be deposited based upon a charge of four mills, is within the power of the Federal Commission in granting the license, and that it must be considered and given effect by the Public Service Commission in fixing the rate, in the same manner as other costs of operation.

The Public Service Commission contends that no power to fix rates for intrastate power has been delegated by Congress to the Federal Power Commission where there is an existing State rate-making authority; that the four-mill provision in the license must yield to the rate fixed by appropriate State authority even if the result is that no money is paid into the emergency diversion fund; and that it appears from the license amendments and from the opinion of the Federal Power Commission that it did not intend to interfere with the rate-making power of the State of New York.

While the company is the only licensee of the Federal Power Commission in New York, the Public Service Commission argues that the principle involved in this proceeding is of general public significance in respect of the integrity of the jurisdiction of State agencies over public utility rates within their boundaries, free from Federal interference. It is argued that if, in the exercise of its authority, the Federal Power Commission could make large amortization requirements in licenses to the benefit of ultimate acquisition of the property by the United States, which must be fully recognized by the State agency in calculating a rate, the power to fix rates would effectively pass from the several States to the Federal Commission where electricity is generated from water under Federal license.

While it is probable that Congress in the exercise of the sovereign power of the United States over navigable waters could impose absolute conditions in the way of amortization for acquisition or for expropriation, or in the charges to be made for generated power, which the States would be required to recognize and to which the rate-making power of the States would yield, it is apparent from the language of the Federal Power Act that authority in this broad scope has not been delegated to the Federal Power Commission. On the contrary the congressional purpose to affirm the right of the States to fix rates for intrastate power and to withhold from the Federal Commission the power to fix intrastate rates where there is an existing State agency for this purpose is fully apparent in the language of the Act.

It is provided that, as a condition of every license granted in pursuance of the Federal Power Act, a public service corporation shall conform with the reasonable regulations of the State agency having jurisdiction and shall abide by the rates and charges prescribed by the State agency (U. S. Code, tit. 16, § 812). In the event the State has no such agency, it is required to be a condition of the license that the Federal Commission be authorized to fix rates, but Congress makes it abundantly clear that this power is immediately withdrawn, even when thus agreed to by the licensee as a condition of the license, upon the establishment by a State of appropriate regulatory authority. The proviso is added in clear language in the section " that the jurisdiction of the [Federal] commission shall cease " as soon as the State shall establish a regulatory authority. Thus, the purpose of Congress to preserve the regulatory power of the States over rates of public utilities operating under Federal licenses seems placed beyond all doubt.

Nothing elsewhere in the Act may be construed to grant the power to fix rates thus plainly withheld. Certainly the authority to require amortization reserves for the ultimate acquisition of the property by the United States carries no rate-making power with it. This provision is to be found in the section dealing with the conditions of licenses generally (U. S. Code, tit. 16, § 803). Subdivision (d) provides that after the first twenty years of operation by a licensee, amortization reserves shall be established " out of the surplus earned " if any in " excess of a specified reasonable rate of return upon the net investment ". This reserve is for the purpose of reducing the net investment to be calculated in the cost of ultimate government acquisition (§ 807). The amortization reserve

depends upon the surplus earned. The earnings depend upon the rate that may be charged for power. The exercise of power by the State agency having jurisdiction of utility rates fits harmoniously with this provision, as indeed it does with the entire Act. The power to provide for a reasonable return on investment — to fix that return in amount — and to require that amounts earned in excess of that be held to amortize the investment for public acquisition is not the equivalent of the power to fix a rate to be charged to consumers. The " surplus " thus applicable is contingent, as the statute itself says. It is a surplus " if any," and among the contingencies is a rate fixed by a State agency large enough to admit of a surplus over the amount fixed by the Federal Commission as a reasonable rate of return on the net investment.

Therefore it seems clear that the Federal Commission is without authority to fix a rate of return binding upon a State agency in fixing the charge to be made to consumers. If the State agency fixes a fair rate for service which results in no surplus over the rate of return fixed by the Federal Commission, no obligation arises to apply a " surplus " which does not come into being.

As a matter of practical statutory construction this subdivision (d) can only be read as providing that the United States, as a condition of its license in the case of a public utility, will require to be applied to its credit the spread between its conception of a fair return on net investment and the amounts collected for the power under the rate orders of a State agency. There is latitude for a difference in the conceptions of the two public authorities as to what a fair return on investment may be, for the purposes of amortization and rate making, respectively, but an applicable surplus will result only when the rate to be charged the consumer is adequate to create one. Normally the views of the two public agencies as to fair return on investment for amortization and for rate purposes would probably be in close approximation, but since the water energy comes from Federal license the Federal authority could reasonably regard a fair return as somewhat less than the State would for general rate purposes and, since the amortization is designed to cover a long period (thirty years of the fifty years' license period), the general purpose of lowering the cost of public appropriation would thus be effectuated.

The statute does not admit of authority in the Federal Commission to fix a " rate " binding on a State commission to be charged to consumers in order to establish a spread between

such " rate " and a " specified reasonable rate of return " to apply to amortization. The authority to fix the reasonable rate of return for this purpose is explicit, but under no possible implication does this carry with it authority to fix a " rate " to be charged or followed by a State commission above such reasonable rate of return. The exercise of such power would not only transcend the congressional delegation to the Federal Commission but it would invade a field of rate regulation from which Congress has excluded its agency.

Petitioner correctly argues, I think, that subdivision (e) of section 803 has no application here. That provides for the expropriation to the United States of excessive profits in the event the State has not prevented such profits or expropriated them to itself. This is achieved, so the statute runs, by a payment to the United States, not by payment into a reserve fund of the licensee. Moreover it applies, in any event, only until the period of amortization has been reached, a period of twenty years after the issuance of the license, which in the case of the petitioner here has now arrived. After the period of twenty years, " excessive profits " if not prohibited by the State are presumably to be absorbed in the amortization reserve. But the language of this subdivision, integrated as it must be with other provisions of the Act, gives further persuasive evidence that Congress has shown no intent to limit the regulatory power of the States over charges to be made.

The Federal Commission has the power to write into its licenses " such other conditions " not inconsistent with the Federal Power Act as it may require [§ 803, subd. (g)]. But the imposition of a rate for power from which a rate of return on investment is to be calculated, binding upon a State agency and preventing the State from fixing a lower rate to be charged for the power, is plainly not consistent with a statute which in all its enactments on the subject so carefully preserves the integrity of State rate regulation.

It would seem to follow, therefore, that whether the inclusion of four mills in the licenses is treated as a point for calculation of surplus above a fair return for the purpose of amortization reserve under one branch of the Federal Commission's authority or as an expropriation of excessive profits under another, the four mills employed for either purpose must yield to a lower rate for the service fixed by the Public Service Commission, and such a lower rate when fixed marks the measure of the surplus, or excess profit, as the case may be, which must be deposited in the reserve. If the State order

wipes out the margin, as it has done here, the obligation of the utility to deposit ceases. Accordingly, nothing in the license or its amendments may be treated as invalidating the rate order of the State Commission of which petitioner complains in this proceeding.

The facts leading to the amendments of the license, the opinion of the Federal Commission, its communications with the company, and other matters of public record, seem to give rather persuasive support to the further contention of the Public Service Commission that the Federal Power Commission did not intend by the four-mill provision in the license amendments to establish a ceiling binding upon the State Commission in fixing a rate to be paid by consumers for the power.

In view of the desire of the United States to reduce as far as possible the cost of producing war materials (see letter and memorandum of the President of the United States attached to the petition) it seems inconceivable that the Federal Power Commission should have intended that the war industries using the additional power made available should pay for the power at the rate of $1,000,000 a year in excess of the amount at which the company was ready to furnish the power without a profit, in order that a fund should be created to reduce the cost of acquisition of the property at the end of the license period in 1971. So remote a benefit to the government carrying with it a manifest burden upon the war effort could not possibly outweigh the pressing necessity of the immediate present which has occupied so large a share of the energy and ingenuity of the government, of keeping war production costs at a minimum.

It is argued that the fund need not be held until 1971, but the alternative is an acceleration of payment to the company itself which the Federal Commission may allow to " be applied from time to time in the reduction of the net investment ". [§ 803, subd. (d).] The alternative thus offered is no more consistent with the purpose of the government to reduce war costs than if the fund be held until 1971. The Public Service Commission's order on the contrary passes the saving of $1,000,000, to be realized between the cost of power under the old rate and the power furnished from the additional water by the company without profit, directly to the war industries, and hence to the production of war materials, and it is a result harmonious with the purpose of the Federal Government and presumably with the purpose of the Federal Power Commission. Indeed, the Federal Commission expressly stated in its

official communications with the company that it proposed to eliminate excessive revenues arising from the additional diversions.

I think that the Federal Commission, finding a four-mill rate existing under the former order of the Public Service Commission for this form of power before the additional diversion, merely undertook to provide a temporary mechanism in the " emergency diversion reserve " for the disposition of the money that would result from the difference between the Public Service Commission's former rate and the cost of the power, until the State Commission established a lower rate, and to provide further for whatever differential might exist between the cost of production as treated by the Federal Commission and any rate fixed by the State Commission higher than such cost of production.

This intent is made manifest in the two telegrams of the Federal Commission to the company temporarily authorizing the diversions (June 12, 1941, and November 29, 1941) and in the Federal Commission's opinion (No. 65) made in connection with the amendments and referred to in the Federal Commission's order. The Federal Commission stated that it would impose terms designed " to prevent the enjoyment of any excessive profits " (Telegram Nov. 29, 1941), and it stated that the company " may and probably will " derive profits in excess of $1,000,000 a year (obviously under the former rate of the Public Service Commission) and that the letter and spirit of the Act " preclude us from allowing a licensee to enjoy such profits from an emergency measure passed solely in the interests of national defense " and finding it appropriate that " such profits " be used to reduce the investment and to prevent " such excess revenues from being credited to the company's surplus accounts or distributed in dividends." (See Federal Power Commission opinion No. 65 in connection with the license amendments, in 2 Federal Power Commission Reports 461, 463.)

The Federal Commission therefore, apparently recognizing that it had no power to fix rates for power in this instance devised an instrument to prevent the former four-mill rate fixed by the State Commission from becoming a source of profit to the company, and set up the " emergency diversion reserve " as such an instrument. It did not follow precisely the authority of the Federal Power Act to expropriate " excessive profits " directly to the United States before the period of amortization had begun [§ 803, subd. (e)] or to provide for disposition of

a surplus " in excess of a specified reasonable rate of return upon the net investment " [subd. (d)] since its purpose was, with the consent of the company, to eliminate any profit and not to fix a " reasonable rate of return " which would usually contemplate some profit. Into whichever of these categories the license amendments may fall, the Federal Commission's action, if designed solely to eliminate excess profits, must have been intended to terminate when the State acted to eliminate them by its lower rate, or, if designed to make a disposition of a surplus, must have been intended to terminate if the State, again by fixing a lower rate, eliminated the surplus.

Finally, the intent of the Federal Commission to leave the rate to be charged for the power to the State for regulation is apparent from the express language of the license amendments themselves which in each instance provide that the " rights and privileges granted " are " without prejudice to and shall in no wise affect the authority of the State of New York or of any agency or instrumentality thereof."

The Public Service Commission has now done directly and effectively what the Federal Power Commission sought to do, but, because of the limitations of its power, could not do directly — it has fixed a rate which does not admit of a surplus or excess profit arising from the additional diversion. The rate fixed by the State eliminates the necessity of resort to the device of holding a large accumulating surplus of $1,000,000 a year by eliminating the rate which would create that surplus. The Public Service Commission's order, therefore, carries out directly and presently the policy of the United States to reduce the cost of war production. Its order is made upon sound authority, is consistent with the Federal statute, and is valid.

Accordingly the petition is dismissed upon the merits without costs. Submit final order. Papers filed.